1  **DAVID M.C. PETERSON**
   California Bar No. 254498
2  **KRIS J. KRAUS**
   California Bar No. 233699
3  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
4  San Diego, California  92101-5008
   Telephone:  (619) 234-8467
5  david_peterson@fd.org
   kris_kraus@fd.org
6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                   **(HONORABLE LARRY A. BURNS)**

11  UNITED STATES OF AMERICA,        )   Case No.:  08cr0361-LAB
                                     )
12           Plaintiff,              )   Date:    March 24, 2008
                                     )   Time:    2:00 p.m.
13  v.                               )
                                     )
14  JESUS ACEVES-INIESTRA,           )   **STATEMENT OF FACTS AND POINTS AND**
                                     )   **AUTHORITIES IN SUPPORT OF MOTIONS**
15           Defendant.              )
                                     )
16

17                              **I.**

18                    **STATEMENT OF FACTS**[1]

19         On January 18, 2008, Border Patrol Agent S. Dishman was performing line watch duties in the

20  Imperial Beach area of operations.  At approximately 10:00 a.m., Agent Dishman responded to a call via

21  service radio from a National Guard observer that three individuals were crossing the United States/Mexico

22  International Boundary in an area known as Whiskey Eight, which is approximately 50 yards north of the

23  boundary fence, and attempting to abscond via bicycle.  Agents Dishman and D'Amato apprehended two

24  of the individuals with the assistance of the National Guard observer.  The individual later identified as Jesus

25  Aceves-Iniestra allegedly admitted to being a citizen and national of Mexico, and to having crossed the

26

27    _____

28         [1] The facts alleged in these motions are subject to elaboration and/or modification at the time these
      motions are heard.  Mr. Aceves reserves the right to take a position contrary to the following statement
      of facts at the motions hearing and at trial.  Because he has to date received limited discovery, the
      statement of facts are taken from the complaint's statement of facts signed by the Magistrate Court.

border illegally.  He allegedly stated that he was not in possession of immigration documents that would allow him to enter into or remain in the United States legally.  Mr. Aceves-Iniestra was arrested and transported to the Imperial Beach Border Patrol Station for processing.

While in custody at the border patrol station, Mr. Aceves was questioned by Border Patrol Agents. Mr. Aceves was allegedly advised of his Miranda rights, and allegedly waived them.  Mr. Aceves then allegedly admitted that he is a citizen and national of Mexico illegally present in the United States, and further that he had not applied or requested permission to re-enter the United States legally.  The government filed a one-count indictment charging Mr. Aceves with in violation of 8 U.S.C. § 1326, attempted illegal entry after deportation, on February14, 2008.  These motions follow.

## II.

## THE COURT SHOULD COMPEL DISCLOSURE OF THE GRAND JURY TRANSCRIPTS TO AVOID INJUSTICE

### A.    Introduction

This Court told the January 2007 Grand Jury that prosecutors are "duty-bound" to present exculpatory information to them, see Reporter's Partial Transcript of the Proceedings, dated January 11, 2007 (Exhibit A hereto) at 20, and that "[if] there's something adverse or that cuts against the charge, you'll be informed of that."  See Reporter's Transcript of Proceedings, dated January 11, 2007 (Exhibit B hereto) at 14-15.  While the validity of an indictment following these instructions is disputed below, they are specifically relevant to Mr. Aceves' need for the transcripts of the grand jury proceedings in his case.  The prosecutor had exculpatory information at the time of indictment.  Any failure to present that to the grand jury would create a substantial injustice and would merit dismissal of the indictment.  See United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986).  Mr. Aceves moves for production of the grand jury transcripts under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), and makes his showing of particularized need for the transcripts below.

### B.    Relevant Facts

Limited discovery was provided to defense counsel in this case on January 28, 2008.  Roughly two weeks later, Mr. Aceves was indicted by the January 2007 Grand Jury.  The limited discovery provided by the government, before it took Mr. Aceves' case to the grand jury, contains two particular pieces of

exculpatory evidence. Failure to disclose this evidence to the Grand Jury would seriously call into question the jury's finding of probable cause. First, in the interrogation by border patrol agent Felix Padilla following his arrest, Mr. Aceves stated that, to the best of his knowledge, he was born in the United States, and that there was evidence in existence proving that he is a citizen. Second, Mr. Aceves' "rap sheet," which was also provided by the government to defense counsel on January 28, 2008, contains repeated references to his place of birth, which it identifies as "CALIFORNIA," as well as numerous references to his citizenship, which is repeatedly listed as "UNITED STATES." <u>See</u> Excerpt of FBI Rap Sheet, attached hereto as Defense Exhibit C ("Ex. C"), at 1. There is no evidence that this information was provided to the July 2007 Grand Jury that returned the indictment. Failure to provide this information to the Grand Jury would be highly unjust. For that reason, Mr. Aceves has a particularized need for the Grand Jury Transcripts in his case; his need outweighs the value of Grand Jury secrecy.

### 1)    Mr. Aceves' Interrogation By Border Patrol Agent Padilla Contains Exculpatory Information

In Mr. Aceves' interrogation by Border Patrol, provided by the government to defense counsel on January 28, the following exchange occurs:

AGENT PADILLA:  Where were you born?
MR. ACEVES:     I was raised in LA. I've been LA since I was a little kid. From what I know I was born in LA, [inaudible] I was a little kid. That's where I've been since I was a little kid.
AGENT PADILLA:  So you don't know of what country you are a citizen?
MR. ACEVES:     I went to court, the judge told me that I could fight it when I was out there. He said if I was a United States Citizen, like I needed some paperwork to show that I was a US citizen, [be]cause based on I was in LA since I was a little kid.
AGENT PADILLA:  So you're not sure if you were born in the US or Mexico?
MR. ACEVES:     I'm not sure
AGENT PADILLA:  Do you have any documentation to show that you were born in the United States?
MR. ACEVES:     I got like, I don't have nothing because I got locked up when I was like 15.
AGENT PADILLA:  Is there anyone that can prove you were born in the United States?
MR. ACEVES:     My mom and my dad, family. I mean, I went to school there, I got like - since kindergarten and everything.
AGENT PADILLA:  But your parent's could prove that you were born in the United States?
MR. ACEVES:     Probably, yeah.

### 2)    Mr. Aceves' FBI Rap Sheet Also Contains Exculpatory Information

The limited discovery provided defense counsel on January 28, 2008, includes seven pages from Mr. Aceves' FBI "rap sheet." Beginning on page thirteen of government discovery, there is an abundance of exculpatory information. The first page of the FBI report is the "CLETS" match for Mr. Aceves. <u>See</u>

Exh. C at 1. That page contains basic biographical and physical description pertaining to Mr. Aceves. On the twenty-second printed line is the following: "POB/CA." As this court will see from reading Exhibit C, in context, it is clear that this means "Place of Birth: California." But the exculpatory information does not end there. On the following page is a description of the fingerprint match, which the government will argue connects Mr. Aceves to the rap sheet. The page contains Mr. Aceves' name, birth date, and other identifying information. On line thirteen of that page are the words "BIRTH PLACE." On the following line and immediately below is the word "CALIFORNIA." See id. at 2. On the very next page there appears again biographical and physical descriptions related to Mr. Aceves. Again, on the fifteenth printed line appear the words "POB/CA." Id. at 3. Two pages later, there again appears reference to Mr. Aceves' birth place as California. Id. at 5. More importantly, however, there appears the word: "CITIZENSHIP." Immediately following and underneath that appear the words: "UNITED STATES." Id. at 5. On the following page, there again appears reference to Mr. Aceves as being born in California and being a United States Citizen. Id. at 6. On the following page, there again appears the very same reference to Mr. Aceves as being born in California and being a United States Citizen. Id. at 7.

In short, Mr. Aceves' seven-page FBI rap sheet alone contains seven instances of exculpatory information. This, when combined with Mr. Aceves' statement to the arresting officer suggesting that he was born in the United States and his parents could help him prove it, tends to undermine probable cause. If it was not presented to the grand jury, it is likely that dismissal will be warranted.

**C.    The Court Should Order Disclosure of All Grand Jury Transcripts Because Evidence Possessed By the Prosecutor At the Time of Indictment Is Exculpatory**

The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit has held that a court should provide the Grand Jury transcripts to defense counsel where failure to do so will avoid a possible injustice. United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986). Walczak requires a showing of a "particularized need" to justify disclosure. As demonstrated above, such a particularized need exists in this case. Id.

To justify release of the transcripts, Mr. Aceves need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii)

1  (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See Walczak, 785

2  F.2d at 857. Here, any failure to present the particular exculpatory information in the prosecutor's possession

3  at the time clearly "may" be grounds to dismiss the indictment, making disclosure of the grand jury

4  transcripts proper under the Federal Rules.

5        As outlined above, there are two specific types of exculpatory evidence; their exculpatory nature is

6  self-evident. Because an essential element of a violation of 8 U.S.C. § 1326 is alienage, any evidence

7  showing that a person is or may be a citizen of the United States is exculpatory. Here, Mr. Aceves' own

8  statements call into question alienage. More importantly, however, official government records provided

9  to the prosecutor by the government's investigating agencies either state defendant's citizenship to be "United

10 States" or his place of birth to be "California" at least seven times in a matter of pages. The prosecutor was

11 duty-bound to provide this mutually corroborative exculpatory information to the grand jury.

12        The grand jury transcripts are necessary to support a motion to dismiss based upon the Government's

13 failure to provide exculpatory information to the grand jury which seriously call into question probable

14 cause, and there may be grounds to dismiss based upon those transcripts. Given the particularized need Mr.

15 Aceves has shown for the transcripts, their production is proper and necessary to achieve the ends of justice.

16                                              **III.**

17  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE THIS COURT'S**
    **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
18  **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
    **AMENDMENT BY DEPRIVING MR. ACEVES OF THE TRADITIONAL FUNCTIONING OF**
19                          **THE GRAND JURY**

20 **A.    Introduction.**

21        The indictment in the instant case was returned by the January 2007 grand jury. See Clerk's Record

22 at 6. That grand jury was instructed by this Court on January 11, 2007. See Reporter's Partial Transcript

23 of the Proceedings, dated January 11, 2007 (Exhibit A hereto). This Court's instructions to the impaneled

24 grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand

25 jury instruction previously given in this district in several ways.[2]   These instructions compounded this

26 _____

27      [2] See e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
    Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II);
28  United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v.

1   Court's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury

2   panel, which immediately preceded the instructions at Ex. A. <u>See</u> Reporter's Transcript of Proceedings,

3   dated January 11, 2007 (Exhibit B hereto).

4       **1.     This Court Instructed Grand Jurors That Their Singular Duty Is to
    Determine Whether or Not Probable Cause Exists and That They Have
    No Right to Decline to Indict When the Probable Cause Standard Is
    Satisfied**

7       After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

8   responsibility, <u>see</u> Exh. A at 3, 3-4, 5,[3] this Court instructed the grand jurors that they were forbidden "from

9   judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

10  federal law or should not be a federal law designating certain activity [as] criminal is not up to you." <u>See</u>

11  <u>id.</u> at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

12  that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

13  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

14  be insufficient.'" <u>See</u> <u>id.</u> at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict

15  because the grand jurors disagree with a proposed prosecution.

16      Immediately before limiting the grand jurors' powers in the way just described, this Court referred

17  to an instance in the grand juror selection process in which it excused three potential jurors. <u>See</u> <u>id.</u> at 8.

18      I've gone over this with a couple of people. You understood from the questions and answers
    that a couple of people were excused, I think three in this case, because they could not adhere
19      to the principle that I'm about to tell you.

20  <u>Id.</u> That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

21  disagreement with Congress. <u>See</u> <u>id.</u> at 8-9. Thus, this Court not only instructed the grand jurors on its view

22  of their discretion; it enforced that view on pain of being excused from service as a grand juror.

23      Examination of the recently disclosed voir dire transcript, which contains additional instructions and

24  commentary in the form of the give and take between this Court and various prospective grand jurors,

25  reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists

26  

27      <u>Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28      [3] <u>See also</u> <u>id.</u> at 20 ("You're all about probable cause.").

and its statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of its earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  In this passage, this Court twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are this Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause.  Because of the redactions of the grand jurors' names, Mr. Aceves will refer to them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration cases.  See id.

This Court made no effort to determine what sorts of drug and immigration cases troubled the CSW.  It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, it provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go

1    forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

2

3    See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand

4    juror know that it would not want him or her to decline to indict in an individual case where the grand juror

5    "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id.

6    Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

7    manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

8    charge even if [the CSW] thought the evidence warranted it." See id. Again, this Court's question provided

9    no context; this Court inquired regarding "a case," a term presumably just as applicable to possession of a

10   small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand

11   juror listening to this exchange could only conclude that there was *no* case in which this Court would permit

12   them to vote "no bill" in the face of a showing probable cause.

13       Just in case there may have been a grand juror that did not understand his or her inability to exercise

14   anything like prosecutorial discretion, this Court drove the point home in its exchange with REA. REA first

15   advised this Court of a concern regarding the "disparity between state and federal law" regarding "medical

16   marijuana." See id. at 24. This Court first sought to address REA's concerns about medical marijuana by

17   stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

18   account.

19       Well, those things -- the consequences of your determination shouldn't concern you in the
         sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
20       cannot consider the punishment or the consequence that Congress has set for these things.
         We'd ask you to also abide by that. We want you to make a business-like decision of whether
21       there was a probable cause. . . .

22   Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went

23   on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

24       In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

25   That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

26   juror is obligated to vote to indict if there is probable cause.

27       I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
         I have to make. But my alternative is to vote for someone different, vote for someone that
28

8                                          08cr0361-LAB

supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, this Court then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, this Court made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4]

---

[4] This point is underscored by this Court's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined

See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

### 2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to its instructions on the authority to choose not to indict, this Court also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[5]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause.  If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

---

to indict irrespective of the evidence presented.

[5]  These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  This Court advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, this Court affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

This Court's discussion of once having been a prosecutor before the Grand Jury compounded the error inherent of praising the government attorneys.  See Ex. A at 9-10.  This Court's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, it would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while this Court instructed the Grand Jury that it had the power to question witnesses, This Court's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, this Court gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, this Court unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which This Court Far Exceeded in Its Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

---

[6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1    I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

2    prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

3    the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

4    but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

5    by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

6    Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

7    was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

8    insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

9    Procedure § 15.2(g) (2d ed. 1999)).

10           Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

11   in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

12           The grand jury thus determines not only whether probable cause exists, but also whether to
             "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
13           most significant of all, a capital offense or a non-capital offense -- all on the basis of the
             same facts.  And, significantly, the grand jury may refuse to return an indictment even
14           "'where a conviction can be obtained.'"

15   Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

16   the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

17   not only the initial decision to indict, but also significant questions such as how many counts to charge and

18   whether to charge a greater or lesser offense, including the important decision whether to charge a capital

19   crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

20   majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

21   to indict someone even when the prosecutor has established probable cause that this individual has

22   committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

23   (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

24   (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

25   Ninth Circuit.  But not in this Court's instructions.

26   //

27   //

28   //

1  **C.    This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in**
2  **Both *Vasquez* and *Navarro-Vargas II*.**

3      The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

4  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

5  decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

6  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

7  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

8  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

9  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

10 obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

11 also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

12 Diction and Language Guide 1579 (1999) (brackets in original)).

13     The debate about what the word "should" means is irrelevant here; the instructions here make no

14 such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

15 choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

16 disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

17 indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction flatly

18 bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand

19 juror would read this language as instructing, or even allowing, him or her to assess "the need to indict."

20 Vasquez, 474 U.S. at 264.

21     While this Court used the word "should" instead of "shall" during voir dire with respect to whether

22 an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that it could only

23 mean "should" in the obligatory sense.  For example, when addressing a prospective juror, this Court not

24 only told the jurors that they "should" indict if there is probable cause, it told them that if there is not

25 probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it

26 would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for the

27 grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly

28 it was not.

The full passage cited above effectively eliminates any possibility that this Court intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if this Court said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been its intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

---

[7] This argument does not turn on Mr. Aceves' view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by this Court in its unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

**(1)**    The first occasion occurred in the following exchange when this Court conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and this Court expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)**    In an even more explicit example of what "should" meant, this Court makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

> The Court: . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this

1  context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the
2  juror has no prerogative to do anything other than indict if there is probable cause.

3      Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes
4  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but
5  rather it would "depend on the case."  Thus, it is clear that this Court's point was that if a juror could not
6  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the
7  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual
8  scenarios, perhaps many.  But this Court did not pursue the question of what factual scenarios troubled the
9  prospective jurors, because its message is that there is no discretion not to indict.

10      **(3)**    As if the preceding examples were not enough, this Court continued to pound the point home
11  that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is
12  that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."
13  See id. at 61.

14      **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in
15  every case where there was probable cause, this Court reiterated that "should" means "shall" when it
16  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think
17  that the evidence is sufficient . . . .  Instead your *obligation* is . . . not to bring your personal definition of
18  what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

19      Moreover, this Court advised the grand jurors that the were forbidden from considering the penalties
20  to which indicted persons may be subject.

21      Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
       about because there is a disparity between state and federal law.
22      The Court:  In what regard?
       Prospective Juror: Specifically, medical marijuana.
23      The Court:  Well, those things -- the consequences of your determination shouldn't concern
       you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
24      *that they cannot consider the punishment or the consequence that Congress has set for these*
       *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision
25      of whether there was a probable cause. ...

26  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"
27  would obviously leave no role for the consideration of penalty information.

28

1    The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

2   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

3   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

4   reasons. First, this Court did not use the term "should" in the passage quoted above. Second, that context,

5   as well as its consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

6   ever was any) relied upon by Cortez-Rivera.   The instructions again violate Vasquez, which plainly

7   authorized consideration of penalty information. See 474 U.S. at 263.

8    Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time

9   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

10   was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

11   contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

12   juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

13   Vasquez:

14         The grand jury does not determine only that probable cause exists to believe that a defendant
           committed a crime, or that it does not. In the hands of the grand jury lies the power to charge
15         a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
           significant of all, a capital offense or a non-capital offense – all on the basis of the same
16         facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction
           can be obtained."
17

18   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

19   dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

20   the initial decision to indict, but also significant decisions such as how many counts to charge and whether

21   to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

22   Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

23   See id. at 264.  This Court's grand jury is not Vasquez's grand jury.  The instructions therefore represent

24   structural constitutional error "that interferes with the grand jury's independence and the integrity of the

25   grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment

26   must therefore be dismissed. Id.

27    The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

28   instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Aceves understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

This Court did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. It also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

1    grand jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches

2    of government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

3    1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

4    their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

5    here, this Court has both fashioned its own rules and enforced them.

6    **D.    The Instructions Conflict with *Williams*' Holding That There Is No Duty to Present**
     **Exculpatory Evidence to the Grand Jury.**

7

8         In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

9    argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

10   exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

11   common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

12   judicial authority exists." <u>See id.</u> at 47.  Indeed, although the supervisory power may provide the authority

13   "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

14   amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

15   Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

16   does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u>

17   at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

18   initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

19   claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See id.</u> at 51-55.

20        Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

21   present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

22            Now, again, this emphasizes the difference between the function of the grand jury and the
             trial jury.  You're all about probable cause.  If you think that there's evidence out there that
23           might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
             to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
24           *bound to present evidence that cuts against what they may be asking you to do if they're*
             *aware of that evidence.*
25

26   <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

27   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

28   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

1   id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

2   Navarro-Vargas, 408 F.3d at 1207.

3        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4   if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

5   conveyed by the previous instruction: "You're all about probable cause."  See Ex. A at 20.  Thus, once again,

6   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

7   probably unnecessary in light of the fact that this Court had already told the grand jurors that they likely

8   would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

9   should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

10  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

11  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

12  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

13  you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, this Court informed the

14  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

15  that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15

16  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

17  the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

18  in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

19  to you."  See Ex. A at 27.

20       These instructions create a presumption that, in cases where the prosecutor does not present

21  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

22  exculpatory evidence was presented, would proceed along these lines:

23       (1)    I have to consider evidence that undercuts probable cause.
         (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such
24               evidence to me, if it existed.
         (3)    Because no such evidence was presented to me, I may conclude that there is none.
25

26  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

27  evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

28  bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## IV.

## THE COURT SHOULD SUPPRESS STATEMENTS BECAUSE THEY ARE INVOLUNTARY AND IN VIOLATION OF MIRANDA

### A.    Mr. Aceves' Statements Were Made in Violation of His Miranda Rights

Mr. Aceves was in custody at the time of his interrogation by agent Felix Padilla. The Fifth Amendment to the United States Constitution proscribes compelled, testimonial self-incrimination. When a defendant is interrogated while in custody, he must be informed of his Miranda rights; questioning can only follow a valid waiver of those rights.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966).[8] Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Id. See Orozco v. Texas, 394 U.S. 324, 327 (1969).

Once a person is in custody, Miranda warnings must be given prior to any interrogation. See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980). Those warnings must advise the defendant of each of his or her "critical" rights. United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990). "In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading." United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003) (citing United States v. Connell, 869 F.2d 1349, 1352 (9th Cir. 1989)). "The warning must be clear and not susceptible to

---

[8] In Dickerson v. United States, 530 U.S. 428 (2000), the Supreme Court held that Miranda rights are no longer merely prophylactic, but are of constitutional dimension. Id. at 2336 ("we conclude that Miranda announced a constitutional rule").

1  equivocation." Id. See also id. at 389-90 (vacating illegal entry conviction where defendant was advised
2  of his administrative rights from an I-826 form and later advised of his Miranda rights).  If a defendant
3  indicates that he wishes to remain silent or requests counsel, the interrogation must cease.  Miranda, 384
4  U.S. at 474.  See also Edwards v. Arizona, 451 U.S. 484 (1981).

5      To admit inculpatory statements made by a defendant during custodial interrogation into
6  evidence, the government bears a high burden of proving both that a defendant's Miranda rights
7  were provided and that the defendant's waiver of those rights were "voluntary, knowing, and
8  intelligent." United States v. Binder, 769 F.2d 595, 599 (9th Cir. 1985) (citing Miranda, 384 U.S.
9  at 479).

10  **B.    The Government Has Not Shown That Mr. Aceves Waived His Miranda Rights**

11      The government has not provided the court with any evidence that Mr. Aceves received his
12  Miranda rights.  In addition, it has not provided any evidence that the rights were waived, or that the
13  waiver was valid.

14  **C.    The Government Has Not Proved a Knowing, Voluntary, and Intelligent Waiver**

15      Mr. Aceves' waiver was not knowing, voluntary, and intelligent.  To prove that Mr. Aceves'
16  waiver of his fundamental constitutional rights to an attorney and to remain silent was knowing, the
17  government must show that it was made "with a full awareness of both the nature of the right being
18  abandoned and the consequences of the decision to abandon it." See Moran v. Burbine, 475 U.S.
19  412, 421 (1984).  There is a presumption against waiver, and the Government bears the burden of
20  overcoming that presumption by a preponderance of the evidence. United States v. Bernard S., 795
21  F.2d 749, 751 (9th Cir. 1986) (citing United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998).

22      The government must introduce sufficient evidence to establish that under the "totality of the
23  circumstances," the defendant was aware of "the nature of the right being abandoned and the
24  consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). As the
25  Ninth Circuit has held, the government's burden to make such a showing "is great," and the court
26  should "indulge every reasonable presumption against waiver of fundamental constitutional rights."
27  United States v. Heldt, 745 F.2d 1275, 1277 (9th Cir.1984) (citing Johnson v. Zerbst, 304 U.S. 458,
28  464 (1938)).

"Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir.1998) (en banc) (internal quotation marks and citations omitted).  As further guidance in determining whether a waiver is knowing, the Ninth Circuit has outlined a number of factors to consider:

1)   the defendant's mental capacity;
2)   whether the defendant signed a written waiver;
3)   whether the defendant was advised in his native tongue or had a translator;
4)   whether the defendant appeared to understand his rights;
5)   whether the defendant's rights were individually and repeatedly explained to him; and
6)   whether the defendant had prior experience with the criminal justice system.

Garibay, 143 F.3d at 537-539.

Under the factors outlined by Garibay and under the totality of the circumstances in which they are to be considered, there are considerable indications that Mr. Aceves' waiver of his Miranda rights was neither knowing nor voluntary.  See Declaration of David M.C. Peterson, Esq., Exhibit D hereto.

**D.   The Government Has Not Shown That Mr. Aceves' Statements Were Voluntary**

Under 18 U.S.C. § 3501, before any evidence in the form of defendant's self-incriminating statements is introduced, the "trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." Id.  Per § 3501, the judge is to consider the totality of circumstances, including

(1)   the time elapsing between arrest and arraignment;
(2)   whether the defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession;
(3)   whether or not the defendant was advised of his Fifth Amendment right to remain silent, and the fact that any statement he made could be used against him;
(4)   whether or not the defendant was advised of his right to the assistance of counsel; and,
(5)   whether the defendant in fact had the assistance of counsel when he was questioned

See 18 U.S.C. § 3501.  The Government bears the burden of proving, at least by a preponderance of the evidence, that Mr. Aceves' statements were voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972).  The court must make a determination as to voluntariness by "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon-Guerrero, 847 F.2d 1363, 1365-66 (9th Cir. 1988).

1    While it is the government's burden to prove voluntariness, defense counsel has provided, in

2    declaration form, considerable evidence that Mr. Aceves' statements to Agent Padilla was not voluntary.

3    See Exh. D.

4    **E.    The Statements Must be Suppressed Because They Were Taken In Violation of the Vienna**
     **Convention.**[9]

5

6    Article 36 of the Vienna Convention on Consular Relations, April 24, 1963 U.S.T. 77, provides that

7    law enforcement officials "shall inform...without delay" arrested foreign nationals of their right to

8    notification of their consulates.  The Ninth Circuit has held that this treaty creates enforceable individual

9    rights. Lombera-Camorlinga, 170 F.3d at 1244, (reversed on other grounds, Lombera-Camorlinga, 206 F.3d

10   882, 885 (9th cir. 2000).

11   In order for law enforcement to comply with the "without delay" requirement of Article 36, they must

12   inform a foreign national of their consulate right before any interrogation takes place.  This proposition is

13   supported by the further language that: "The rights referred to in paragraph 1 of this Article shall be

14   exercised in conformity with the laws and regulations of the receiving state."  The most analogous and

15   relevant laws of the this country (the Receiving state) would be the law regarding advisals of rights before

16   questioning by law enforcement.  See Miranda v. Arizona, 384 U.S. 476 (1966).  That body of law requires

17   that people be informed of their rights prior to questioning.  Therefore, to be in conformity with U.S.

18   law—as required by Article 36—the consulate right notification must precede custodial interrogation.

19   The en banc opinion of Lombera-Camorlinga states the exclusionary rule is not the necessary remedy

20   for violations of this treaty, in part because the State Department "indicate[d] that it has historically enforced

21   the Vienna Convention itself, investigating reports of violations and apologizing to foreign government and

22   working with domestic law enforcement to prevent future violations when necessary." It appears now, seven

23   years later, that the State Department's efforts are insufficient to curtail blatant violations of the Vienna

24   Convention.

25   //

26   _____

27       [9] Mr. Aceves recognizes that the *en banc* decision of *Lombera-Camorlinga,* 206 F.3d 882 is to the
     contrary.  Mr. Aceves raises the issue to preserve his appellate record.

28

1    Here, the probable cause statement indicates that Border Patrol agents informed Mr. Aceves of his

2  rights, so it is clear that they were aware of their obligation.  But they advised him of his consular contact

3  right at the termination of the interview (approximately 4:45 P.M.), which greatly diminishes—if it does not

4  completely eviscerate—the protection guaranteed by the Vienna Convention.  Id.  Border Patrol agents did

5  not comply with the "without delay" requirement of Article 36.  Moreover, the probable cause statement is

6  silent as to whether or not the appropriate consulate representative was ever actually notified.

7    Therefore, any statements that occurred after this violation should be suppressed.

8  **F.    Request for an evidentiary hearing**

9  While the government bears the burden of proving (1) a knowing and voluntary waiver of Miranda rights

10  and (2) the voluntariness of defendant's statements, the local rules require a declaration in order to obtain

11  an evidentiary hearing.  Attached hereto is a declaration by defense counsel outlining the reasons defendant

12  requires and merits an evidentiary hearing.  See Ex. D.  Because the government has not met its burden of

13  showing that Mr. Aceves was read his Miranda rights, or that he knowingly waived his Miranda rights, any

14  statements he made in response to interrogation must be suppressed.  Should the court be inclined to deny

15  this motion, an evidentiary hearing is requested.

16  **V.**

17  **THE COURT MUST DISMISS THE INDICTMENT BECAUSE MR. ACEVES' DUE PROCESS**
**RIGHTS WERE VIOLATED AT HIS DEPORTATION HEARINGS**

18

19    The immigration judge (IJ) presiding over Mr. Aceves' deportation hearing failed to obtain a knowing

20  an intelligent waiver of Mr. Aceves' appellate rights.  In addition, the IJ erred when he told Mr. Aceves that

21  he was not eligible for any form of relief, because Mr. Aceves was in fact eligible for relief under 8 U.S.C.

22  § 1182(h).  Finally, the IJ failed to advise Mr. Aceves that he was eligible under 8 U.S.C. § 1229c(b) for a

23  voluntary departure.  The insufficient waiver of appeal, the affirmative misadvisal of Mr. Aceves of his

24  eligibility for relief from deportation, and the failure to advise Mr. Aceves of his eligibility for voluntary

25  departure violated Mr. Aceves' due process rights.

26    These due process violations prejudiced Mr. Aceves because it is beyond "plausible" that Mr. Aceves

27  would either have successfully appealed, would have been granted a voluntary departure, or would have

28

obtained relief under 8 U.S.C. § 1182(h). The following extraordinary conditions would create conditions in which Mr. Aceves likely would have obtained relief of some sort in his hearing, absent the Due Process violations:

> (1)    The IJ was aware that Mr. Aceves either was, or was in a hair's breadth of being, a United States citizen;
> (2)    Mr. Aceves has lived in the United States for virtually his entire life;
> (3)    His disabled father, two sisters and grandparents are all United States citizens living in the Los Angeles area; his mother is an LPR, also living in the Los Angeles area. He has eight aunts and uncles in the Los Angeles area, and over twenty cousins. All of them are either LPRs or United States citizens;
> (4)    Mr. Aceves faces danger and extreme adversity in Mexico, a country he has never within memory lived in. He faces social stigmatization, harassment, suspicion, and physical danger as a "foreigner."

Because Mr. Aceves' deportation hearing contained numerous violations of due process, and because those violations caused Mr. Aceves unusually clear prejudice, the government may not rely on Mr. Aceves 2008 deportation in prosecuting him under 8 U.S.C. § 1326. Since there is no other deportation the government may rely on in prosecuting him, Mr. Aceves moves this Court for an order dismissing the indictment.

**B.    Facts Relevant to Motion**[10]

According to information provided by the government in discovery, on January 7, 2008, an Immigration Judge (IJ) ordered Mr. Aceves deported. See Order of the Immigration Judge, Exhibit E hereto. The IJ explained the right to appeal to a group of more than 20 individuals. He never asked the group if they understood their right to appeal. The IJ merely asked, at the end of his mass reading of this and other rights, if the members of the group understood "their rights," generally. When addressing Mr. Aceves individually, the IJ only asked if he had understood "his rights," and never ascertained that he knew of, understood, and waived his right to appeal.

In addition, the IJ determined that, as a matter of law, Mr. Aceves was not eligible for voluntary departure and thus denied him relief on the basis of his criminal conviction. The IJ also told Mr. Aceves: "I don't see that you qualify for any relief, so I guess I'll, so I'm gonna have to make a decision that you be

---

[10]    Facts referred to are based on information provided by the government. Mr. Aceves does not admit their accuracy and reserves the right to contest them.

removed and deported." <u>See</u> Partial Transcript of Immigration Hearing, Exhibit F ("Ex. F") at 5.  At no time during the deportation hearing did the IJ advise Mr. Aceves of his eligibility for relief from deportation under 8 U.S.C. § 1182(h).

At this time defense counsel is still waiting for further discovery requested of the government from Mr. Aceves' immigration file.  Defense counsel viewed Mr. Aceves' immigration file on March 3, 2008.  Counsel anticipates supplementing this motion once additional documents are received following that viewing.

## C.    Mr. Aceves' Deportation Was Fundamentally Unfair, and Mr. Aceves Was Prejudiced

"In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation."  <u>United States v. Zarate-Martinez</u>, 133 F.3d 1194, 1197 (9th Cir. 1998).  A defendant charged with illegal reentry under section 1326 has a Fifth Amendment right to attack his removal order collaterally because the removal order is a predicate element of his conviction.  <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828, 837-38 (1987) ("Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding.").  <u>See also</u> <u>United States v. Ubaldo-Figueroa</u>, 364 F.3d 1042, 1047-48 (9th Cir. 2004) (citing <u>Zarate-Martinez</u> and <u>Mendoza-Lopez</u> for these principles).

To successfully collaterally attack his deportation, Mr. Aceves must demonstrate that: 1) he exhausted all administrative remedies available to him to appeal his removal order; 2) the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and, 3) the entry of the order was fundamentally unfair.  8 U.S.C. § 1326(d); <u>Ubaldo-Figueroa</u>, 364 F.3d at 1048.  "An underlying removal order is 'fundamentally unfair' if:  '1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and 2) he suffered prejudice as a result of the defects.'"  <u>Ubaldo-Figueroa</u>, 364 F.3d at 1048 (citing <u>Zarate-Martinez</u>, 113 F.3d at 1197) (brackets omitted).

Importantly, although Mr. Aceves carries the initial burden on the issue of prejudice, once Mr. Aceves makes a prima facie showing of prejudice, **"the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome."**  <u>United</u>

States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003) (emphasis added).  As explained below, Mr. Aceves can demonstrate each of the elements necessary for this Court to sustain his collateral attack.

### 1.    Mr. Aceves Is Exempt From the Requirement That He Exhaust Administrative Remedies

Mr. Aceves' appellate waiver was invalid, because, as discussed below, (1) the IJ's advisals regarding his appellate rights were inadequate; and (2) the IJ failed to inform Mr. Aceves of two forms of relief from deportation for which he was eligible.  Accordingly, Mr. Aceves is exempt from the exhaustion requirement.

Had Mr. Aceves "validly waived the right to appeal [his removal order] during the deportation proceedings," he would be barred under 8 U.S.C. § 1326(d) from collaterally attacking his underlying removal order as a defense to the section 1326 charge.  Ubaldo-Figueroa, 364 F.3d at 1048 (quoting United States v. Muro-Inclan, 249 F.3d 1180, 1182 (9th Cir. 2001)).  However, the exhaustion and deprivation of judicial review requirements cannot bar collateral review when—as in this case—the waiver of the right to administrative appeal did not comport with due process.  Id.

A waiver of the right to appeal a removal order does not comport with due process when it is not "considered and intelligent."  Id.  See also United States v. Pallares-Galan, 359 F.3d 1088, 1096 (9th Cir. 2004); United States v. Leon-Paz, 340 F.3d 1003, 1005 (9th Cir. 2003).  As the Ninth Circuit held in Pallares-Galan:

> For a waiver to be valid, the government must establish by "clear and convincing evidence," Gete v. INS, 121 F.3d 1285, 1293 (9th Cir. 1997), *that the waiver is "considered and intelligent*." United States v. Lopez-Vasquez, 1 F.3d 751, 753-54 (9th Cir. 1993)(en banc); see also United States v. Gonzalez-Mendoza, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a due process violation where immigration judge failed to inquire whether right to appeal was knowingly and voluntarily waived).

Pallares-Galan, 359 F.3d at 1097 (emphasis added.).  In this case, the government cannot establish by clear and convincing evidence that Mr. Aceves' appellate waiver was "considered and intelligent," because Mr. Aceves' waiver was based on three separate inadequate and inaccurate advisals regarding his rights.

### 2.    Mr. Aceves Was Deprived of Judicial Review

To sustain a collateral attack on his removal order, Mr. Aceves must also demonstrate that the deportation proceedings improperly deprived him of judicial review.  8 U.S.C. § 1326(d)(2).  As explained above, Mr. Aceves was deprived of the opportunity for judicial review, because he did not make a

considered and intelligent waiver of his right to appeal. He did not make a considered and intelligent waiver of his right to appeal because the IJ: (1) did not explain the right to him adequately, (2) improperly advised him that he was ineligible for relief from deportation, and (3) improperly failed to advise Mr. Aceves of his eligibility for voluntary departure. In Ubaldo-Figueroa, the Ninth Circuit found the "deprivation of judicial review" requirement met when an IJ failed to inform a petitioner of his right to appeal the deportation order. Ubaldo-Figueroa, 364 F.3d at 1050. Mr. Aceves was deprived of judicial review because of the IJ's inadequate advisals regarding appellate waiver, the IJ's failure to inform him of his eligibility for relief from deportation, and the IJ's failure to inform him of his eligibility for voluntary departure.

**3.      Mr. Aceves' Deportation Was Fundamentally Unfair**

      **a.      Mr. Aceves Was Denied Due Process**

            **i)      Mr. Aceves Was Inadequately Advised Regarding His Appellate Waiver**

The fact that the IJ never asked Mr. Aceves if he understood his appellate rights demonstrates that any purported waiver was not considered and intelligent. See, e.g., Zarate-Martinez, 133 F.3d 1194, 1198 (9th Cir. 1998) (holding that IJ's conversation with petitioner where IJ asked, "do you understand your rights?" and petitioner responded "yes," did not "qualify as an express or implied 'voluntary or intelligent' waiver of the right to appeal, even though IJ had previously informed the group that they would have the right to appeal) (overruled on other grounds in United States v. Ballesteros-Ruiz, 319 F.3d 1101, 1105 (9th Cir. 2003)); Pallares-Galan, 359 F.3d. at 1093, 1098 (no express or implied waiver where IJ asked alien if he wished to appeal and alien stated that "[i]t would be better if I leave my children, that's fine" (emphasis removed)); United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000) (finding due process violation in a section 1326 collateral appeal because IJ failed to tell the defendant about his eligibility for waiver of deportation); United States v. Arce-Aceves, 163 F.3d 559, 563 (9th Cir. 1998) (same); United States v. Lopez-Vasquez, 1 F.3d 751, 753 (9th Cir. 1993) (en banc) (alien's waiver was not "considered and intelligent" even though the IJ thoroughly explained the right to appeal at a group hearing because the IJ failed to solicit separate responses from each individual; fact that the petitioner knew what an appeal was "was insufficient"; the IJ's actions may have conveyed the message that the petitioners would not benefit from an appeal).

//

1    The IJ in Mr. Aceves' deportation hearing only informed the group—at least twenty individuals—at

2  the outset of the hearing of their right to appeal.  See Ex. F at 1.  He then only asked if they understood their

3  "rights," to which members of the group responded "yes" in unison.  There is no indication that Mr. Aceves

4  himself said yes at that time.  The IJ never asked the group, or any individual, if they understood their right

5  to appeal, specifically.  There is no indication that Mr. Aceves understood specifically his right to appeal,

6  as he was never asked.  The IJ never inquired as to whether Mr. Aceves understood what an appeal was, or

7  whether he understood his right to appeal.  When the individual part of the hearing pertaining to Mr. Aceves

8  occurred, the judge only asked at the outset "Did you understand your rights?"  Ex. F at 2.  The judge *at no*

9  *point* asked Mr. Aceves, or the group as a whole, if they specifically understood the right to appeal.  Finally,

10  the judge ended Mr. Aceves' individual portion of the hearing by asking, "Are you gonna appeal to a higher

11  court?"  Ex. F at 7.  Without confirming that Mr. Aceves knew that he had this right, and knew what the

12  right was, and would be waiving the right by saying no.

13    Mr. Aceves' situation is on all fours with Zarate-Martinez, 133 F.3d at 1198, where the Ninth Circuit

14  found that there was no valid waiver of the defendant's appellate right.  In Zarate-Martinez, the IJ told a

15  group of 22 people about the appellate process, then asked them if they understood their right to appeal.  En

16  masse, the group responded, "yes."  Later on in the hearing, the judge asked Mr. Zarate-Martinez if he

17  understood his rights.  Mr. Zarate-Martinez responded in the affirmative.  The Ninth Circuit held that these

18  statements, combined, "do not qualify as an express or implied 'voluntary and intelligent' waiver of [the]

19  right to appeal."  Id.  Mr. Aceves' situation is almost exactly analogous to Zarate-Martinez.  The judge told

20  the group of the appellate right, but only asked en masse if they understood their rights.  Ex. F at 1.  Mr.

21  Aceves was asked individually only if he understood his "rights."  Ex. F at 2.  The only difference between

22  Mr. Aceves' hearing and the hearing at issue in Zarate-Martinez is that the IJ in Mr. Aceves' case was even

23  less clear in attempting to elicit a knowing and intelligent waiver of the group's appellate rights.  In Zarate-

24  Martinez, the judge asked the group if it understood its right to appeal; in Mr. Aceves' hearing, the judge

25  never asked the group if they understood their right to appeal, he only asked the group if they understood

26  their "rights," generally.  Ex. F at 1.

27  //

28  //

Like the appellate advisals held inadequate in the cases cited above, the IJ's appellate advisal in this case was invalid.  Because Mr. Aceves' waiver of appeal was based upon an insufficient explanation of his appellate right and an insufficient waiver, he was denied due process.

### ii) The IJ Failed to Advise Mr. Aceves of His Eligibility for Relief under 8 U.S.C. § 1182(h)

Mr. Aceves was also eligible for relief under 8 U.S.C. § 1182(h).[11]  While this waiver is not available to legal permanent residents who have been convicted of an aggravated felony, Taniguchi v. Schultz, 303 F.3d 950, 957-958 (9th Cir. 2002), no such bar applies when a person has never been lawfully admitted for permanent residence.  See id. at 958 (allowing 212(h) waivers for non-LPRs but denying it for LPRs does not violate equal protection).  The only requirement of 212(h) for someone who is not an LPR is that they have an immediate family member—parent, spouse, or child—who is a United States citizen or legal permanent resident.  8 U.S.C. § 1182(h).  Here, both of Mr. Aceves' parents make him eligible—his father is a United States citizen and his mother is a legal permanent resident.

The record of his deportation proceeding contains more than an inference that he was eligible for such release.  It contains a clear statement by Mr. Aceves that his father was a United States citizen, which would make him eligible for relief.  See Ex. F at 4.  Where the record contains such an inference, "the IJ must advise the alien of this possibility and give him the opportunity to develop the issue." Moran-Enriquez v. INS, 884 F.2d 420, 422-23 (9th Cir. 1989).  The Ninth Circuit has found this requirement to be "mandatory." Arce-Hernandez, 163 F.3d at 563.

Mr. Aceves was not only denied the right to know about his potential eligibility for relief; he was affirmatively misadvised when the judge told him that he was not eligible for any relief.  The IJ informed Mr. Aceves that he was not eligible for any relief, and never even mentioned the possibility of relief under § 1182(h).  Ex. F at 5.

To be eligible for relief under § 1182(h), a person must show that he is the spouse, parent, son or daughter of United States citizen or a legal permanent resident.  Mr. Aceves informed the judge at the very least that his father was a citizen.  Ex. F at 4.

---

[11] This form of relief is often referred to as "212(h) relief."  See United States v. Arietta, 224 F.3d 1076, 1079 (9th Cir. 2000).

The Ninth Circuit has held, simply and plainly, that where a person is eligible for relief under § 1182(h) the IJ has a mandatory duty to advise him of that fact. Arrieta, 224 F.3d at 1079. Because the IJ failed to inform Mr. Aceves of his eligibility for relief for deportation, his waiver of the right to appeal from the deportation order was invalid, and due process was denied.

### iii)    The IJ Failed to Advise Mr. Aceves of His Eligibility for Voluntary Departure from the United States

Mr. Aceves was also prejudiced because the IJ did not inform him that he was eligible for another form of relief from deportation—voluntary departure—despite the fact that Mr. Aceves was eligible for such relief. The IJ never spoke with Mr. Aceves at all about any potential grounds of relief that he may have been eligible for. In fact, the IJ misadvised Mr. Aceves by stating that "I don't see that you qualify for any relief, so I guess I'll, so I'm gonna have to make a decision that you be removed and deported." See Exh. F at 5. After a brief discussion as to whether Mr. Aceves was a citizen, he then ordered Mr. Aceves deported. The IJ asked "are you gonna appeal to a higher court?" Ex. F at 7. Mr. Aceves said, "no, sir." Id. Of course, the IJ's misadvisal as to 212(h) relief *and* voluntary departure, both of which were available to Mr. Aceves, strongly suggested to Mr. Aceves that he would receive no benefit from an appeal.

### (a)    Summary of Argument Regarding Voluntary Departure

Despite the admonition to the contrary, Id. at 5, Mr. Aceves *was* eligible for relief from removal under 8 U.S.C. § 1229c(a), voluntary departure pre-conclusion of proceeding. As Mr. Aceves was eligible for this form of relief, the IJ's failure to advise him of this rendered the proceeding fundamentally unfair.

The IJ first erred by never even raising the possibility of pre-conclusion voluntary departure relief under § 1229c(a). As someone whom the IJ found to be an unlawful entrant who had never been inspected and authorized to enter the United States, Mr. Aceves did not fall under § 1229c(a)'s provision disqualifying "[a]ny alien who is convicted of an aggravated felony at any time after admission." See 8 U.S.C. § 1227(a)(2)(A)(iii). Mr. Aceves was therefore eligible for voluntary departure. By failing to advise Mr. Aceves of his eligibility, as required by the Pallares-Galan and Muro-Inclan line of cases, the IJ deprived him of any opportunity for judicial review.

This Court need look no further than the plain language of 8 U.S.C. § 1229c(a) to determine whether Congress intended an aggravated felon who was not convicted after being lawfully admitted to remain

eligible for pre-conclusion voluntary departure—it did.  Thus, although there exists a regulation advancing a different standard, 8 C.F.R. § 1240.26, the regulation is invalid and the agency interpretation is entitled to no Chevron deference.

Complicating this relatively straightforward undertaking, however, is 8 U.S.C. § 1229c(e), which purports to convey to the AG unfettered authority to further restrict eligibility for voluntary departure.  Admittedly, this legislative delegation, if valid, provides a separate and independent ground that lends 8 C.F.R. § 1240.26 legitimacy.  It is not valid, however, because § 1229c(e) is an unconstitutional delegation of legislative power that violates separation of powers.  Because the regulation is neither a permissible interpretation of the controlling statute nor an exercise of validly conveyed authority, the plain text of § 1229c(a) controls.

### (b)    The Plain Language of the Statute Controls

This Court's interpretive task begins with the plain language of the statute.  See Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1168 (9th Cir. 2006).  No deference is due to "an agency's construction of the statute which it administers . . . [if] Congress has spoken directly to the precise question at issue [and] the intent of Congress is clear."  Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1320 (9th Cir. 1990) (quoting Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)).  When "Congress has spoken directly, in unambiguous terms," the Court need look no further—"that is the end of the matter."  Id.  Legislative prerogative requires the judicial inquiry to end with clearly stated plain language because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Id.

When analyzing the text of § 1229c(a), this Court is "obliged to give effect, if possible, to every word Congress used."  Clark, 460 F.3d at 1175.  This Court has "consistently rejected interpretations that would render a statutory provision surplusage or a nullity."  Id. (quoting In re Cervantes, 219 F.3d 955, 961 (9th Cir. 2000); alterations omitted).  Reading the words "at any time after admission" out of the provision incorporated by § 1229c(a) would violate the rule that the statutory text be construed in "the broader part of the statute as a whole" in order to "avoid a construction which renders any language of the enactment superfluous."  See id. at 1175, 1176 (citations omitted).  "Only where a sensible result isn't reachable may

[this Court] resort to the drastic step of ignoring statutory language." Id. (quoting Hearn v. W. Conference of Teamsters Pension Tr. Fund, 68 F.3d 301, 304 (9th Cir. 1995)(alterations omitted)).

The Ninth Circuit Court of Appeals has embraced Mr. Aceves's reading. See Ortiz-Lopez, 385 F.3d at 1205 n.3 ("Relief from removal under § 1229c(a) is categorically barred to . . . those 'deportable under section 1227(a)(2)(A)(iii),' which in turn means those convicted of an aggravated felony at any time after admission."). Perhaps more compelling, the Attorney General, in promulgating 8 C.F.R. § 1240.26, has also acknowledged that the § 1229c(a) plainly states what Mr. Aceves now argues. See Interim Rules Implementing IIRIRA, 62 Fed. Reg. 10312, 10326, Att'y Gen. Order No. 2017-97 (March 6, 1997) ("Sections 240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction."). These comments make clear that the AG was aware of the conflict between the regulation he issued and the statutory text; the AG viewed the regulation as correcting a perceived "anomaly" created by the plain language, see id. ("The Department does not believe that Congress intended [the anomaly of more favorable treatment for aggravated felons who enter without inspection]."). The AG believed that issuing the regulation changed the state of the law. Id. ("the Department now exercises its discretion to bar such aliens from receiving this form of relief").

### (c)    No Exception to the Plain Language Rule Applies

The regulation cannot, however, trump the statutory text as a matter of interpretation unless "applying the plain language of the statute would lead to patently absurd results," United States v. Brown, 333 U.S. 18, 27 (1948), or "would render another section within the statute or within the act inoperative or contradictory," Yates v. Hendon, 541 U.S. 1, 17-18 (2004). Because neither exception applies, the "strong presumption that Congress has expressed its intent in the language it chose" is dispositive. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987); cf. Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc., 448 F.3d 1092, 1096 (9th Cir. 2006) (Bybee, J., dissenting from denial of rehearing en banc) ("I know of no 'illogicality' doctrine that permits us [or the AG] to change the words in a statute when we think there is a more logical way that Congress could have written it.").

Section 1229c(a)'s explicit limiting language, which makes pre-conclusion voluntary departure relief unavailable for someone who entered lawfully and then committed an aggravated felony but permits an unlawful entrant convicted of such a crime to apply for such relief makes sense.   Different treatment of lawful and unlawful entrants reflects several perfectly rational policy choices:  (1)  lawful entrants who committed a serious crime after they were granted the privileges and benefits of lawful admission have engaged in an abuse of trust that unlawfully present felons have not;[12] (2) such persons "pose[] a potentially higher risk of recidivism," Taniguchi v. Schultz, 303 F.3d 950, 958 (9th Cir. 2002), and should not get the "second chance" to lawfully reenter that voluntary departure could offer, see Lara-Ruiz v. INS, 241 F.3d 934, 948 (7th Cir. 2001); (3) for unlawfully present criminal aliens, it is a higher priority to ensure their physical departure from the U.S. as expeditiously as possible, with minimal resistance and minimal expenditure of the administrative resources necessary to complete a full-fledged removal hearing;[13] (4) the "benefit" of voluntary departure is virtually illusory for unlawful entrants because they are less likely to have the familial ties to seek lawful reentry, and therefore this form of relief achieves the same result as formal removal while saving the expense of subsidizing the alien's return travel;[14] and (5) Congress need only address a given problem "one step at a time."[15]  Thus, Congress's chosen language is clear.

---

[12] The "abuse of trust" rationale has been embraced by at least seven circuits to explain analogous ineligibility of criminal legal permanent residents (LPRs) versus criminal non-LPRs, who are eligible for INA § 212(h) relief.  See Cordes v. Gonzales, 421 F.3d 889, 897 (9th Cir. 2005); Latu v. Ashcroft, 375 F.3d 1012, 1020-21 (10th Cir. 2004); De Leon Reynoso v. Ashcroft, 293 F.3d 633, 640 (3d Cir. 2002); Jankowski-Burczyk v. INS, 291 F.3d 172, 176 (2d Cir. 2002); (Lukowski v. INS, 279 F.3d 644, 647-48 (8th Cir. 2002); Moore v. Ashcroft, 251 F.3d 919, 925-26 (11th Cir. 2001); Lara-Ruiz v. INS, 241 F.3d 934, 947-48 (7th Cir. 2001).

[13] Section 1229c(a) requires the alien to pay his "own expense[s]" and is only available "in lieu of being subject to proceedings . . . or prior to completion of such proceedings."

[14] Cf. De Leon Reynoso, 293 F.3d at 640 (eligibility for lawful return of unlawful entrants, because they likely lack "the ties to obtain a relative to petition the Attorney General for adjustment of status," is "more theoretical than real . . . and could have led Congress to omit non-LPRs in [§ 1229c's disqualification provision]").

[15] Jankowski, 291 F.3d at 179.  Moreover, "Congress may well have considered that it had already suitably solved the problem presented by [unlawful entrant] aggravated felons" through § 1228's expedited removal provisions, which foreclose all relief so long as the AG elects to use this mechanism. Jankowski, 291 F.3d at 179.

1    Neither is the plain language of § 1229c(a) a "typographical error," which might justify a regulatory

2    correction of Congress's inadvertent mistake. To the contrary, the plain meaning, advocated by Mr. Aceves,

3    is "fully grammatical and can be understood by people of ordinary intelligence." Amalgamated Transit

4    Union, 448 F.3d at 1098 (dissent). Had it so desired, Congress could quite easily have substituted the

5    language it used, "is not deportable under section 1227(a)(2)(A)(iii)," with the regulatory language, "has not

6    been convicted of a crime described in section 101(a)(43) of the Act" or with even simpler language, such

7    as "has not been convicted of an aggravated felony." It did not.[16] The plain language controls.

8                    **(d)        Section 1229c(e) Does Not Authorize the Narrowing Regulation**

9    The only remaining source of authority for 8 C.F.R.§ 1240.26 is 8 U.S.C. § 1229c(e), which

10   provides: "The Attorney General may by regulation limit eligibility for voluntary departure under this section

11   for any class or classes of aliens." 8 U.S.C. § 1229c(e) ("Additional conditions").  To the extent that this

12   grant of authority supports the AG's promulgation of § 1240.26(b)(1)(i)(E) (enlarging § 1229c(a)'s class of

13   ineligible aliens to include all individuals convicted at any time of an aggravated felony), it transgresses the

14   constitutional principles of separation of powers and limit on legislative delegation.

15   Section 1229c(e) purports to convey to the AG the quintessentially legislative power to repeal duly-

16   enacted legislation, in violation of the Constitution's dedication of such authority to Congress. See U.S.

17   Const. Art. I , § 7 (laws may be made only upon bicameral passage and presentment to the President);

18   Clinton v. New York, 524 U.S. 417, 438 (1998) (absence of a Constitutional provision "that authorizes the

19   President [or the Attorney General] to enact, to amend, or to repeal statutes" is "equivalent to an express

20   prohibition"). Section 1229c(e)'s delegation of power suffers from the same problems as the Line Item Veto

21   Act (LIVA), struck down by the Supreme Court in Clinton.  The President's power to unilaterally veto

22   provisions of duly-passed budgetary legislation under LIVA amounted to the power of unilateral repeal—a

23   power the President may not constitutionally posses. Id. at 445-46 ("The fact that Congress intended such

24   a result if of no moment.").  Like LIVA, § 1229c(e) unconstitutionally authorizes an executive branch

25

26        [16] Congress's word choice was not due to confusion about the difference between deportability and
27   inadmissibility, as the AG suggests, 62 Fed. Reg. at 10326.  Congress was well aware of this difference,
     evident from its ability to distinguish between these concepts in the very same section of IIRIRA.  See,
28   e.g., Pub. L. 104-208, § 304 (defining removable as inadmissible under § 212 or deportable under § 237).

officer, the AG, to repeal or partially repeal § 1229c(a)'s provision creating the possibility of pre-conclusion voluntary departure. Under its terms, the AG could "limit eligibility for voluntary departure" by making it entirely unavailable—effectively repealing that part of the statute. See id. at 441 ("cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled"). It makes no difference that Section 1240.26 exercises § 1229c(e)'s power to effect a partial (and not a full) repeal of § 1229c(a)—by eliminating voluntary departure for the group of otherwise eligible unlawful entrants to which Mr. Aceves belongs, but not for everyone. See Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 473 (2001)  (an agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power"). Neither does the AG's discretion to deny voluntary departure on an individual basis ameliorate the problem because the regulation results in a crucial functional difference: it abrogates the right to individual consideration for relief. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266-68 (1954) (the BIA's "*failure to exercise* its own discretion, contrary to existing valid regulations," due to the AG's blacklisting of petitioner, violated petitioner's due process right to the "opportunity to try . . . to convince the Board" to exercise discretion in his favor); accord Clinton, 524 U.S. at 446-47, 466-67 (Scalia, J., dissenting) (advancing such an argument, rejected by the Court).

Section 1229c(e)'s standardless grant of authority to restrict voluntary departure eligibility also runs afoul of the nondelegation principle because it fails to "lay down . . . an intelligible principle to which the person or body authorized to act is directed to conform." Whitman, 531 U.S. at 472 (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). Indeed, the statute provides "literally no guidance of the exercise of discretion." Id. at 474. Under its terms, the AG may "limit eligibility . . . for *any* class or classes of aliens." 8 U.S.C. § 1229c(e) (emphasis added). This unfettered grant of authority stands in stark contrast to legitimate delegations, where Congress has typically identified a specific purpose,[17] "declared a general rule and imposed the duty of ascertaining what particular cases came within the rule," see Panama

---

[17] See United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725, 416 F.3d 977, 979-80 (9th Cir. 2005) (agency to define what sort of shotgun "is generally recognized as particularly suitable for sporting purposes"); see also South Dakota v. United States Department of the Interior, 423 F.3d 790, 798-99 (8th Cir. 2006) (statute authorizing the Secretary of the Interior to acquire property "for the purpose of providing land for Indians").

Refining Co. v. Ryan, 293 U.S. 388, 426 (1935), or charged the agency with a micro-level administrative task, see Whitman, 531 U.S. at 475 (agency to define which types of grain elevators are "country elevators"). Because "Congress has set up [no] standard for the [AG's] action," has not "required any finding by the [AG] in the exercise of the authority" under the provision, and has made no clear declaration of policy, § 1229c(e)'s broad grant of authority is at the least constitutionally infirm, if not entirely unconstitutional. See Panama Refining Co., 293 U.S. at 415.

Particularly telling is the fact that the AG has employed § 1229c(e)'s power to contravene the express language used by Congress, see 62 Fed. Reg. at 10326, a decision made on the same policy level as the legislative act—which smacks of an "undemocratic" legislative attempt to "escap[e] the sort of accountability that is crucial to the intelligible functioning of a democratic republic."[18] John Hart Ely, Democracy and Distrust 132 (1980) (legislators may delegate power to avoid "politically controversial decisions—to leave them instead to others, most often others who are not elected or effectively controlled by those who are"); see also Cass R. Sunstein, Nondelegation Canons, 77 U. Chi. L.Rev. 315, 317-18 (2000) ("certain highly sensitive decisions should be made by Congress, and not by the executive pursuant to open-ended legislative instructions").

In light of its likely, if not actual, unconstitutionality, constitutional avoidance at the very least requires the scope of § 1229c(e) to be limited to authorize only legitimate administrative purposes. One possible construction would limit "any class or classes of aliens" to classes defined by some nexus to reducing the administrative burden, which is in line with § 1229c(a)'s goal of permitting physical removal without the expending the time and resources necessary to conduct a full hearing. Other provisions of 8 C.F.R. § 1240.26 advance such a goal: subsection (A) requires a request to happen at the earliest merits

---

[18] This risk appears doubly likely in light of § 1229c(e)'s jurisdiction-stripping provision: "No court may review any regulation issued under this subsection." This sentence does not bear upon the appeal at hand, where appellate jurisdiction is undisputed in this direct federal criminal appeal. Moreover, 8 U.S.C. § 1252(a)(2)(D), permitting judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals," appears to permit direct review of the argument raised by Mr. Aceves, notwithstanding "any other provision of this chapter . . . which limits or eliminates judicial review." Finally, precluding consideration of the regulation here would raise serious constitutional problems. Accord United States v. Klein, 80 U.S. (13 Wall.) 128, 146 (1871) (Congress lacks authority to enact statutes purporting to deny jurisdiction, but which effectively "prescribe a rule for the decision of a cause in a particular way").

hearing; (B) permits relief only once; (C) requires the alien not to contest removability; and (D) ensures that no appeal will be taken. Subsection (E), by contrast, would be unauthorized by such a construction because it lacks such a nexus and would actually *increase* the administrative burden by requiring an IJ to conduct a full hearing for individuals like Mr. Aceves and bear the additional burden of potential appeal.

### b. Denial of Due Process in Mr. Aceves's Deportation Proceeding Prejudiced Him[19]

Finally, Mr. Aceves must show that the proceedings were fundamentally unfair in a way that prejudiced him. As noted above, "[a]n underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (quoting Zarate-Martinez, 133 F.3d at 1197). To establish prejudice, Mr. Aceves does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050 (citing Arrieta, 224 F.3d at 1079). Furthermore, as noted previously, although Mr. Aceves carries the initial burden on the issue of prejudice, once Mr. Aceves makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome. Gonzalez-Valerio, 342 F.3d at 1054 (emphasis added).

### 1) Mr. Aceves Suffered Prejudice As a Result of the IJ's Misadvisal as to His Appellate Rights

Mr. Aceves' invalid waiver of his deportation right was prejudicial because he could have won relief as to both of the rights that he was denied in the immigration proceeding in the first instance. His prejudice arising out of the denial of each of those is discussed below. Had Mr. Aceves been properly informed of his right to appeal, he likely would not have waived it. On appeal, Mr. Aceves would at the very least have received a remand on the improper finding that he was ineligible for voluntary departure or for relief under § 1182(h). Because Mr. Aceves would have had a meritorious appeal, the denial of his appeal right and the invalid waiver elicited by the IJ was prejudicial to his right to appeal.

//

------

[19] As defense counsel receives more information, defense counsel will supplement this motion with further evidence of prejudice.

1

2

**2)  Mr. Aceves Suffered Prejudice As a Result of the IJ's Misadvisal of His Eligibility for Relief Under § 1182(h)**

3

To demonstrate prejudice at his removal hearing, Mr. Aceves "does not have to show that he actually

4

would have been granted relief.  Instead, he must only show that he had a 'plausible' ground for relief from

5

deportation."  <u>Ubaldo-Figueroa</u>, 364 F.3d at 1050 (9th Cir. 2004) (internal citation omitted); <u>Arietta</u>, 224

6

F.3d at 1079.

It is not just that Mr. Aceves was eligible for 212(h) relief; it also more than plausible that he would

7

have been granted relief.  "In order to obtain a § 212(h) waiver, the alien must demonstrate that his

8

deportation would cause 'extreme hardship' to a 'spouse, parent or child' who is a citizen or lawful permanent

9

resident."  <u>Arietta</u>, 224 F.3d at 1079-80.

10

**(a)      Family Ties, Community Ties, Work History, and Rehabilitation**

11

"The existence of family ties in the United States is the most important factor in determining

12

hardship."  <u>Id.</u> at 1082.  Mr. Aceves has lived in the United States for his entire life.  Mr. Aceves has

13

extensive family ties in the United States; on the other hand, he has extremely limited contact in Mexico.

14

Mr. Aceves has lived in the Los Angeles, California area for nearly all of his life, in the home of his mother,

15

Yolanda, his father, Silverio, his two sisters, Iris and Teresa Annabel, and his father's parents, Gabriel and

16

Teresa.  All are United States citizens.  His parents work in a swap meet in Los Angeles.

17

In addition to his nuclear family, a large portion of Mr. Aceves' extended family live in the Los

18

Angeles area.  Mr. Aceves has four uncles in the Los Angeles area, all of whom are either LPRs or United

19

States citizens: Abel Aceves—who works in a pharmacy; Rafael Aceves—who works for Canica, a

20

computer company; Hector—an entrepreneur and a manager at Red Bull; and Gabriel, Jr.—a worker at

21

Kaiser-Permanente.  Mr. Aceves also has four aunts in the Los Angeles area, all of whom are either LPRs

22

or United States citizens: Maria Aceves, Claudia Aceves, Yesenia Aceves, and Jessica Aceves.

23

Mr. Aceves previously worked for his Uncle Hector Aceves, who owns two locations of the chain

24

restaurant Don Chente Tacos, one in Downey, California and one in Norwalk, California.  Mr. Aceves' thus

25

has family ties, community ties, a work history, and rehabilitation.

26

**(b)      Hardship to family based upon deportation**

27

28

The situation that Mr. Aceves faces in Mexico also would warrant a favorable exercise of discretion, as well as creating unique and extreme hardship for his United States citizen mother and father. Because Mr. Aceves has—from his younger days—tattoos associated with gangs in the Los Angeles area, he faces constant insecurity in Mexico. He is subject to constant physical danger, the danger of harassment from the police, extremely limited economic opportunity, and no ability to live a normal life there. Merely dealing with the awareness of that is a hardship for Mr. Aceves' mother and father that is an out-of-the-ordinary and extreme. The prospect of her son's deportation was extremely traumatic for his mother; causing her notable depression, because she knew that he has noone in Mexico, he doesn't know anything about Mexico, and faces danger and social stigmatization there, at the young age of eighteen.

An additional factor that would merit the favorable exercise of discretion is the fact that Mr. Aceves' according to discovery, Mr. Aceves applied for permanent residence in 2001, and if he did not ever become a permanent resident, it was only through a bureaucratic error in losing his fingerprints.[20] Because Mr. Aceves' father is a United States citizen, had there not been a mistake in processing his application for permanent residence, he would have become a permanent resident and—per the Child Citizenship Act of 2000, 8 U.S.C. § 1431—a United States citizen.

These numerous equities make it at the very least plausible that Mr. Aceves would have been granted relief under § 1182(h).

### 3) Mr. Aceves Suffered Prejudice As a Result of the IJ's Misadvisal Regarding Voluntary Departure

In addition, the Judge stated at the beginning of the mass hearing that he would grant voluntary departure if they met the requirements, but would deny it if they had a "bad criminal record or a bad immigration record." Mr. Aceves does not have a bad immigration record; before the removal on January 7, 2008, he had no prior deportations. As to Mr. Aceves' criminal history, there is only allegation of a single conviction in 2005. While that conviction is for a serious crime, Mr. Aceves was convicted only of that single crime, and he was fifteen at the time he was arrested for it.

---

[20] This information is based upon the limited discovery provided by the government to date, and in no way constitutes an admission by Mr. Aceves that he was not admitted as a permanent resident.

The numerous compelling reasons to grant Mr. Aceves § 1182(h) relief: the extreme hardship facing his father and mother upon his deportation, the fact that his entire family lives in the United States, that he has lived in the United States for his entire life, and that he faces oppressive and dangerous conditions in Mexico at the young age of 18, also would merit a grant of voluntary departure. Unfortunately, the judge erroneously decided that Mr. Aceves was ineligible for voluntary departure, and thus did not make the discretionary decision he was required to make.

Since Mr. Aceves was, in fact, eligible for pre-conclusion voluntary departure and had a plausible claim for relief, he has satisfied § 1326(d)'s prejudice requirement. When IIRIRA took effect in 1997, it made voluntary departure much easier to obtain under certain circumstances—the provisions set forth in § 1229c(a) (relief granted prior to the conclusion of the immigration hearing). Section 1229c(a), unlike the pre-IIRIRA version of voluntary departure, former 8 U.S.C. § 1254(e), does not require the alien to "establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years." See 8 U.S.C. § 1254(e) (1995). IIRIRA's enactment of § 1229c(a) in 1996 created a new form of voluntary departure whose primary focus was minimizing administrative burdens associated with lawful physical expulsion of illegal aliens—by requiring waiver of the right to a complete hearing, eliminating the availability of judicial review and stays of the time period for departure—rather than rewarding the deserving with a means of avoiding formal deportation. Compare 8 U.S.C. § 1229c(a) (relief available "in lieu of being subject to proceedings under section 1229a of this title or prior to the completion of such proceedings") with § 1254 (1995) (repealed by Pub. L. 104-208 (Sept. 30, 1996)) (requiring a showing of good moral character but not waiver of proceedings).

Within the current immigration scheme, pre-conclusion voluntary departure "reveals Congress' intention to offer an alien a specific benefit—exemption from the ordinary bars on subsequent relief—in return for a quick departure at no cost to the government." Banda-Ortiz v. Gonzales, 445 F.3d 387, 390 (5th Cir. 2006). In effecting this contract-like exchange, the IJ may exercise discretion to grant voluntary

1  departure even in the face of multiple immigration violations and fraud.  See Matter of Polanco-Davila, 2006

2  WL 901504 (BIA 2006).[21]

3      Mr. Aceves has demonstrated that he was willing and able to comply by all of the relevant procedural

4  requirements, including the requirement that he pay his own way.  In sum, the record shows that Mr. Aceves

5  was both eligible for and had a plausible claim for voluntary departure relief.

6                                          **VI.**

7                **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

8      Defense counsel requests leave to file further motions and notices of defense based upon information

9  gained in the discovery process.  To date, counsel has received limited discovery from the government in

10  this matter.[22]

11                                         **VII.**

12                                   **CONCLUSION**

13      For these and all the foregoing reasons, Mr. Aceves respectfully requests that this court grant his

14  motions and grant any and all other relief deemed proper and fair.

15                                          Respectfully submitted,

16

17                                        _/s/ David M.C. Peterson_____
   DATED: February 15, 2008          DAVID M.C. PETERSON
18                                   Federal Defenders of San Diego, Inc.
                                     Attorneys for Mr. Aceves
19                                   E-mail: david_peterson@fd.org

20

21

22

23

24

25  [21] Obviously, because 8 C.F.R. § 1240.26 prohibits it (albeit invalidly), there are no cases where

26  discretion has been exercised in favor of individuals convicted of an aggravated felony.  To fault
    Mr. Ramirez for failing to produce such a case would be patently unfair.

27

28  [22]  Defense counsel forwarded a written request for discovery to the government in a letter dated
    January 28, 2008, and filed a formal motion for discovery on February 21, 2008.

1                                    INDEX OF EXHIBITS

2    Exhibit A       -       Partial Transcript of Proceedings, January 11, 2007

3    Exhibit B       -       Full Transcript of Proceedings, January 11, 2007

4    Exhibit C       -       FBI rap sheet of Jesus Aceves, provided to defense counsel 1/28/2008

5    Exhibit D       -       Declaration of David M.C. Peterson, Esq.

6    Exhibit E       -       Order of immigration Judge

7    Exhibit F       -       Partial Transcripts of Immigration Hearing

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28